SUMMIT DEFENSE
A Professional Law Corporation
JAMES T. REILLY, Attorney at Law
California State Bar No. 67254
4040 Civic Center Drive, Suite 200
San Rafael, CA 94903

Phone:  510-412-8900
Cell:   415-913-0787
email:  jim@summitdefense.com

Attorneys for Defendant
ADRIAN KYLE BENJAMIN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,     : | Case No. CR 20-00442 SI |
| Plaintiff,                    : | DEFENDANT'S SENTENCING MEMORANDUM |
| vs.                           : | |
| ADRIAN KYLE BENJAMIN,         : | Hearing Time/Date: 1:00 pm, Friday October 1, 2021 |
| Defendant.                    : | |

Defendant **Adrian Kyle Benjamin** hereby submits his **Defendant's Sentencing Memorandum**.

Date: September 24, 2021          Respectfully submitted,

_____
                                  JAMES T. REILLY, Attorney at Law
                                  Counsel for Defendant
                                       **Adrian Kyle Benjamin**

DEFENDANT'S SENTENCING MEMORANDUM   -1-

**DEFENDANT'S SENTENCING MEMORANDUM**

**I**

**INTRODUCTION**

Mr. Benjamin appreciates the significant time and effort that was obviously put into the preparation of the Presentence Report in this matter by United States Probation Officer Specialist Monica Romero. He agrees that the factual recitations are accurate and that the sentencing recommendations are consistent with the United States Sentencing Guidelines. Nevertheless, for reasons discussed below, he respectfully disagrees with the recommendation that the court apply USSG §§ 2G2.2(c)(1) & 2G2.1 to raise the base offense level to 32.

Mr. Benjamin also appreciates, with respect to the calculation of the offense level, the government's commitment to the terms of the plea agreement which was originally signed by Mr. Benjamin on December 17, 2020. (US Sentencing Memorandum, Page 8, lines 10-17.)

Finally, Mr. Benjamin also appreciates the Court's consideration of the PSR, the government's sentencing memorandum and this Defendant's Sentencing Memorandum. For the reasons discussed below, Mr. Benjamin respectfully submits that imposition of a sentence of the low end of the agreed upon sentencing range, 108 months, would be sufficient, but neither greater nor less than necessary, to comply in this case with the statutory sentencing purposes.

In all other respects, Mr. Benjamin is prepared to accept the terms of his sentence and supervised release as recommended in the Presentence Report.

## II

## RESPONSE TO PRESENCE REPORT

### A

### The Court Should Not Apply USSG §§ 2G2.2(c)(1) & 2G2.1.

Although the probation officer is correct in asserting that application of USSG § 2G2.2(c)(1) would otherwise be justified on the facts of this case, the government is under no legal compulsion to insist that a defendant accept a plea agreement which includes application of every potential offense or offense characteristic. Were the law otherwise, it seems likely that very few plea agreements would ever be reached.

Unlike a case in which the defendant has been convicted at trial and regarding which an all-encompassing assessment of the sentencing guidelines would be appropriate, Mr. Benjamin and the government have agreed that a specific selection of sentencing guidelines will be applicable to his sentencing in this case.

In this regard, Federal Rules of Criminal Procedure, Rule 11(c)(1)(C), provides in pertinent part that:

> (c) Plea Agreement Procedure.
>     (1) *In General.* An attorney for the government and the defendant's attorney … may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:
> …
>         (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

The parties having specified in the plea agreement which sentencing factors would apply, if the court accepts the plea agreement, the provisions thereof would be binding on the court.

Furthermore, as conceded in the government's Sentencing Memorandum (page 8, lines 13-17), promises made by the government to a defendant in plea negotiations "must be fulfilled". (*United States v. Heredia*, 769 F.3d 1220, 1231 (9th Cir. 2014.)

That being the case, Mr. Benjamin respectfully submits that the court should find that the correct base offense level in this case is 22 and that the correct total offense level is 31, as set forth in the plea agreement. This provides a sentencing range of 108-135 months in prison.

**B**

**Mr. Benjamin's Mental and Emotional Health.**

The PSR notes (page 20, paragraphs 104-109) that Mr. Benjamin suffers from undiagnosed mental and emotional health conditions which can be reasonably concluded to have contributed to the offense conduct involved in this case.

While he was at the halfway house, he was referred by his pretrial services officer to the HOPE Program for mental health treatment. Unfortunately, this treatment terminated when he was remanded into custody on May 14, 2021.

Nevertheless, the HOPE Program reports expressed concerns about Mr. Benjamin's self-reported dissociative disorder.

Significantly in this regard, the PSR notes (page 25, paragraph 139) that:

**DEFENDANT'S SENTENCING MEMORANDUM   -4-**

> The defendant may have a history of untreated and undiagnosed mental health conditions as he disclosed a history of suicidal ideation, depression, and anxiety in addition to concerns of dissociative disorder as indicated by a therapist at HOPE Program. The Court can consider these mitigating factors pursuant to 18 U.S.C. § 3553(a), when determining whether a sentence outside the advisory guideline range is warranted.

Without more extensive treatment and mental health analysis it is impossible to know with certainty what role Mr. Benjamin's mental health issues played in the commission of the conviction offense. However, the article attached as Exhibit A to the government's Sentencing Memorandum (Document 59-1) provides some interesting insights on this subject.

Significantly, the article drew several distinctions between "online/Internet offenders" who have no in-person contact with their victims and "offenders who committed contact sexual offenses".  (US Exhibit A, page 10 of 16, 1st Paragraph of "Offender Characteristics".)

Online offenders were generally found to be younger than contact offenders and that they:

> … tended to have fewer offense-supportive attitudes, less emotional identification with children and greater victim empathy (i.e., an offender's awareness and understanding of the impact of sexual offending on the victim).
> (*Ibid*., citing Elliott, Beech, Mandeville-Norden & Hayes, 2009.)

The article also notes that:

> Offenders assigned to the intimacy-deficit pathway reported high levels of emotional loneliness and low levels of self-esteem.  This is a finding that is frequently documented in the literature, whereby individuals may engage in problematic Internet use and associated sexually motivated behavior in order to alleviate loneliness and dissatisfaction, as well as compensate for a lack of intimacy.  (*Ibid*., last full paragraph, citations omitted.)

**DEFENDANT'S SENTENCING MEMORANDUM  -5-**

The article goes on to discuss the "Characteristics of Groomers/Chat Room Offenders". (US Exhibit A, page 11 of 16, righthand column.) Based on mental health evaluations of convicted offenders, two subtypes of offenders were identified: "fantasy driven" and "contact driven".

In this regard, the article notes:

> While the former was characterized by a motivation to engage adolescents in cybersex, the latter subgroup was motivated by a desire to develop a sexual relationship with an adolescent. This was reflected in the comparatively short online interaction. (*Ibid*.)

And goes on to note that "fantasy driven" offenders:

> … motivation to offend did not appear to be precipitated by sexual deviancy or criminological behavior but was rather associated with increased social isolation and dysphoric moods as a result of greater internet use. (*Ibid*., 2nd paragraph, citing Briggs, P., Simon, W.T., & Simonsen, S. (2011).)

Mr. Benjamin never having had in-person contact with any of the victims in this case, he is properly characterized as a "fantasy driven" offender.

This conclusion belies some of the characterizations employed in the US Sentencing Memorandum, such as that Mr. Benjamin was a "sophisticated criminal", that he "employed mastery over grooming techniques used by seasoned predators" and that he asserted himself "as an authority figure".

Based on the available information, it appears that Mr. Benjamin was a lonely, depressed, socially isolated, and probably mentally ill individual who was acting out sexual fantasies.

Not that this excuses his conduct … it does not. It does, however, put it into perspective with respect to the spectrum of child sexual abusers, placing him at the low end of that spectrum.

**DEFENDANT'S SENTENCING MEMORANDUM  -6-**

It also provides grounds for the court to find mitigating circumstances pursuant to 18 U.S.C. § 3553(a), as suggested by the Probation Officer. (PSR, page 25, paragraph 139).

### III

### RESPONSE TO US SENTENCING MEMORANDUM

In addition to the responses discussed above, Mr. Benjamin disputes the conclusions reached by the government on the basis of Exhibit B to the US Sentencing Memorandum.  (Document 59-2)

There is no doubt that the consequences of childhood sexual abuse can be severe and can even, as suggested in the government's memo, persist for a lifetime.  However, it is once again necessary to put these potential consequences into perspective.

Exhibit B was published in 2001 after having been submitted to The Journal of Psychology in 1999 (see last page of the article). It provides a "meta-analysis" of previously published articles, all of which are listed in the "References", starting on Page 19 of Exhibit B.  The abstract of the article (Page 3 of Exhibit B) notes that it contains an analysis of "Thirty-seven studies published between 1981 and 1995 …."

This tells us that the subjects of these studies were all victims of "contact driven" offenders.  Which is to say that they were all physically molested by the offenders, rather than being (as were all of the victims in this case) subjected only to online sexual abuse.

**DEFENDANT'S SENTENCING MEMORANDUM   -7-**

The 2008 article "Online 'Predators' and Their Victims: Myths, Realities, and Implications for Prevention and Treatment", published in ***American Psychologist***, is enlightening in this regard.[1]

The opening paragraph of the article sets the timeline:

> Media stories about "online predators" who use the internet to gain access to young victims have become a staple of news stories since ***the late 1990s***, when youth Internet use became widespread. (***Emphasis*** added.)

In other words, the online "fantasy driven" offender did not yet even exist during the time period covered by the study in the government's Exhibit B.

Defendant's Exhibit A goes on to note that:

> The reality about Internet-initiated sex crimes -- those in which sex offenders meet juvenile victims online -- is different, more complex, and serious but less archetypically frightening than the publicity about these crimes suggests. (Defendant's Exhibit A, pp. 111-112.)

Some other salient observations from Defendant's Exhibit A include:

> The research about Internet-initiated sex crimes makes it clear that the stereotype of the Internet child molester who uses trickery and violence to assault children is largely inaccurate (Wolak, Finkelhor, & Mitchell, 2004). Most Internet-initiated sex crimes involve adult men who use the Internet to meet and seduce underage adolescents into sexual encounters. (Defendant's Exhibit A, page 112, 1st paragraph of section "How Do Internet Sex Offenders Operate".)

And:

> Although there is little research specifically about online child molesters, there are indications that they occupy a narrow range on the spectrum of the sex offender population, one that largely excludes pedophiles and

---

[1] A copy of the article is attached hereto as Defendant's Exhibit A. It is also available online at:

**https://www.apa.org/pubs/journals/releases/amp-632111.pdf**

**DEFENDANT'S SENTENCING MEMORANDUM  -8-**

>violent or sadistic offenders.  (Defendant's Exhibit A, page 118, last sentence of section "Online Child Molesters:  Who Are They?".)

Significantly this article also notes that:

>**Online child molesters are rarely violent.**
>Violence is rare in Internet-initiated sex crimes.  The evidence from the N-JOV Study (Wolak et al., 2004) suggests that online molesters are not among that minority of child offenders who abduct or assault victims because they have sadistic tendencies or lack the interpersonal skills to gain the confidence and acquiescence of victims (Lanning, 2002). … Abduction is also rare.  None of the victims in the N-JOV Study were abducted in the sense of being forced to accompany offenders.  (Defendant's Exhibit A, page 119, bottom paragraph of left column.)

Once again, this is not to excuse or condone online sexual abuse generally or Mr. Benjamin's conduct in particular.  Nevertheless, it is intuitively obvious -- and supported by both the cited article and other research -- that the severity of the harm done to minors is less when the contact is "fantasy driven" online contact than it is when the contact results in in-person sexual contact.

This conclusion is even borne out by both the PSR and the US Sentencing Memorandum, in that neither reports any harm whatsoever suffered by any of the victims in this case.[2]

## IV

## 18 U.S. CODE §3553 SENTENCING CONSIDERATIONS

### A

### The Nature and Circumstances of the Offense

---

[2] The US Sentencing Memorandum indicates (Footnote 2 on page 8) that "some of Benjamin's victims intend to submit letters to the Court and also to speak at sentencing."  As of the preparation of this memorandum, defense counsel has not been provided with any victim letters.

**DEFENDANT'S SENTENCING MEMORANDUM  -9-**

There is no gainsaying the seriousness of sexual offenses against minors.  However, as discussed above, on the spectrum of such offenses, "fantasy driven" online contact which does not result in physical contact between the offender and the minor is significantly less serious (and less dangerous to the victims) than is "contact driven" conduct which results in physical molestation.

**B**

**The History and Characteristics of the Defendant**

As noted in the PSR, Mr. Benjamin has no history of criminal conduct, but does have a history of a loneliness, depression, social isolation, and likely mental illness, all of which probably contributed to acting out sexual fantasies in violation of the law.

His early agreement to plead guilty in this case also demonstrates his acceptance of responsibility for his actions.

**C**

**The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Because the actual harm in this case appears to have been comparatively minor, Mr. Benjamin's offense is less serious than other child sexual abuse offenses in general and even online offenses in particular.  A prison commitment for the low end of the sentence range – 108 months - would provide just punishment in this case.

Spending 9 years in a federal prison would also impress on Mr. Benjamin how wrong his conduct was and – particularly with appropriate mental health treatment while imprisoned – would promote his respect for the law.

### D
### The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

The offense charged in this case is relatively unusual.  As noted in Defendant's Exhibit B, online sexual offenders "occupy a narrow range on the spectrum of the sex offender population" and are rarely violent.  Mr. Benjamin fits this profile and a sentence of 108 months would provide adequate deterrence to future conduct of this nature on his part.

### E
### The Need for the Sentence Imposed to Protect the Public from Further Crimes by the Defendant

While Mr. Benjamin's continued offensive conduct after first being contacted by the FBI - and then again after being arrested and placed in the halfway house – suggests that a significant sentence is necessary to protect the public from further crimes on his part, a 108-month sentence would suffice in this regard.

Once again, active participation in appropriate mental health treatment while incarcerated would also ameliorate the likelihood of his re-offending once released from prison.

**DEFENDANT'S SENTENCING MEMORANDUM   -11-**

**F**

**The Need for the Sentence Imposed to Provide the Defendant With Needed Education or Vocational Training or Correctional Treatment in the Most Effective Manner**

As noted above, a 108-month sentence would provide ample opportunity for Mr. Benjamin to receive the mental health treatment that he appears to need. It would also quite likely give him the opportunity to undergo vocational training that would enable him to obtain employment once he is released.

**V**

**CONCLUSION**

Mr. Benjamin respectfully submits that imposition of a sentence at the low end of the applicable sentencing range would be sufficient, but neither greater nor less than necessary, to comply with the statutory sentencing purposes in this case.

He therefore respectfully requests that the court sentence him to imprisonment for a term of 108 months.

Date:  September 24, 2021          Respectfully submitted,

_____

JAMES T. REILLY, Attorney at Law
Counsel for Defendant
**Adrian Kyle Benjamin**